NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

**Electronically Filed
Intermediate Court of Appeals
29447
14-JAN-2014
09:24 AM**

NO. 29447

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

KELLEY WOODRUFF, M.D.; and
HAWAII CHILDREN'S BLOOD AND CANCER GROUP,
Plaintiffs-Appellants/Cross-Appellees,
v.
HAWAI'I PACIFIC HEALTH; KAPI'OLANI MEDICAL SPECIALISTS;
KAPI'OLANI MEDICAL CENTER FOR WOMEN AND CHILDREN;
ROGER DRUE; FRANCES A. HALLONQUIST;
NEAL WINN, M.D.; and SHERREL HAMMAR, M.D.;
Defendants-Appellees/Cross-Appellants,
and
DELOITTE & TOUCHE LLP; and DENNIS M. WARREN, ESQ.,
Defendants-Appellees
and
JOHN DOES 1-99; JANE DOES 1-99; DOE ENTITIES 1-20;
and DOE GOVERNMENTAL UNITS 1-10, Defendants

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 02-1-0090)

MEMORANDUM OPINION
(By: Nakamura, Chief Judge, and Fujise and Reifurth, JJ.)

This case arises out of events surrounding the termination of Kelley Woodruff, M.D. (Dr. Woodruff) from her employment with Kapi'olani Medical Specialists (KMS) and Kapi'olani Medical Center for Women and Children (KMCWC). Dr. Woodruff is a pediatric hematologist/oncologist.

In 1999, Kapi'olani Health (KH), the parent corporation for KMCWC and KMS, entered into a Corporate Integrity Agreement (Integrity Agreement) with the federal government to ensure KH's compliance with federal health care programs. The Integrity

Agreement obligated KH to report any material deficiencies or overpayments it discovered relating to its billing practices. KH retained the accounting firm of Deloitte & Touche LLP (D&T) to investigate certain billing practices, and it hired attorney Dennis Warren (Warren) to assist in the investigation. Based on the investigative findings, KH provided a voluntary disclosure submission to the federal government which reported that Dr. Woodruff had submitted "invalid claims to KH's Central Billing Office for payment by third party payors."

After the voluntary disclosure submission was provided, Dr. Woodruff's employment with KMS and KMCWC was terminated. Dr. Woodruff then joined with Robert W. Wilkinson, M.D. (Dr. Wilkinson) in forming the Hawaii Children's Blood and Cancer Group (HCBCG).

Dr. Woodruff and HCBCG (collectively, "Plaintiffs") sued: (1) KH's successor, Hawai'i Pacific Health (HPH),[1] KMS, KMCWC, and their employees Roger Drue (Drue), Frances A. Hallonquist (Hallonquist), Neal Winn, M.D. (Dr. Winn), and Sherrel Hammar, M.D. (Dr. Hammar) (collectively, "HPH Defendants"); (2) D&T; and (3) Warren. In their second amended complaint, Plaintiffs asserted fifteen counts, including counts alleging defamation, breach of Dr. Woodruff's employment contract, and anti-competitive and unfair practices.

The HPH Defendants, D&T, and Warren (collectively, "Defendants") filed multiple motions for summary judgment. Through a series of orders, the Circuit Court of the First Circuit (Circuit Court)[2] granted summary judgment in favor of Defendants on all counts raised in Plaintiffs' second amended complaint.

---

[1] According to HPH, on December 20, 2001, KH merged with Straub Clinic & Hospital and the Wilcox Health Systems to form HPH.

[2] The Honorable Bert I. Ayabe presided over the proceedings relevant to this appeal.

On appeal, Plaintiffs argue that the Circuit Court committed various errors in granting summary judgment in favor of Defendants. As explained below, we are not persuaded by the arguments raised by Plaintiffs on appeal, and we therefore affirm the Circuit Court's grant of summary judgment in favor of Defendants.

The HPH Defendants also filed a notice of appeal from the purported "deemed denial" of their motion for costs, which they assert was caused by the Circuit Court's failure to rule on their motion within ninety days. We hold that Plaintiffs' notice of appeal divested the Circuit Court of jurisdiction to decide the HPH Defendants' motion for costs. Therefore, the motion for costs is still pending before the Circuit Court and there is no ruling on the motion for costs for this court to review.

BACKGROUND

I.

Dr. Woodruff is board certified in pediatric Hematology and Oncology. In 1993, Dr. Woodruff entered into private practice with Dr. Wilkinson, focusing on pediatric Hematology and Oncology. Drs. Woodruff and Wilkinson utilized KMCWC, where they both held medical staff privileges, in treating their patients.

In 1995, KMCWC hired Dr. Wooodruff as the Medical Director of its Pediatric Ambulatory Unit (PAU). The PAU Medical Director was required to be a member of the faculty at the John A. Burns School of Medicine (Burns Medical School), and Dr. Woodruff also became an assistant professor at the Burns Medical School. After assuming these new positions, Dr. Woodruff continued to maintain her private practice with Dr. Wilkinson.

In August of 1997, KMS hired Dr. Woodruff as a physician in its Hematology/Oncology Division. KMS also hired Dr. Wilkinson as the Medical Director of the Hematology/Oncology Division. Dr. Woodruff treated patients in collaboration with other members of the KMS Hematology/Oncology Division, which included Darryl Glaser, M.D., Wade Kyono, M.D., and Desiree

Medeiros, M.D., and an oncology nurse practitioner, Diane Fochtman (Nurse Fochtman), who was assigned to the PAU.

KH was the parent corporation for KMCWC and KMS.[3] On December 20, 2001, KH merged with Straub Clinic & Hospital and the Wilcox Health Systems to form HPH.

II.

In the mid-1990's, KH was the subject of an investigation by the Office of the Inspector General of the United States Department of Health and Human Services (OIG) into violations for false billing claims. In August of 1999, as part of a settlement agreement with the federal government, KH entered into the Integrity Agreement with the OIG. The purpose of the Integrity Agreement was to "ensure compliance by [KH's] subsidiaries . . . , physicians with staff privileges, employees, contractors and third parties . . . with the requirements of Medicare, Medicaid and all other Federal health care programs[.]"

The Integrity Agreement required that KH retain an independent review organization, which has:

> expertise in the reimbursement and billing requirements of the Federal health care programs, to review and audit on an annual basis the billing policies, procedures and practices of KH to verify that KH's submissions for reimbursement comply with all applicable [standards] and to identify any and all instances where claims fail to meet these standards.

(Emphasis added.) To comply with this requirement, KH retained the D&T accounting firm.

The Integrity Agreement obligated KH to conduct compliance training and education programs regarding proper billing practices for its employees. KH was required to conduct training that included a discussion of "the submission of accurate bills for services rendered to Medicare and/or Medicaid patients"; polices and procedures applicable to documentation of medical records; the obligation of individuals involved in the billing process to ensure accurate billings; reimbursement rules

---

[3] KH was also the parent corporation for Kapi'olani Medical Center at Pali Momi, which is not involved in this litigation.

and statutes; legal sanctions for improper billings; and "examples of proper and improper billing practices."

The Integrity Agreement further obligated KH to self-report any overpayments or material deficiencies it discovered. KH was required to notify the payor of "any billing, coding or other policies and/or practices that resulted in an overpayment" within thirty days of discovering the overpayment and to take remedial measures within sixty days of discovery. KH was also required to notify the OIG within thirty days of discovering a "material deficiency."[4] As part of its obligation to self-report material deficiencies, KH was required to submit a report to the OIG that included: (1) a complete description of the material deficiency including relevant facts, the people involved, and any legal authority on the matter; (2) the actions taken to correct the material deficiency; and (3) any further plans to prevent the reoccurrence of the material deficiency.

The threshold imposed by the Integrity Agreement for KH to self-report a material deficiency was low. KH's self-reporting obligation was triggered if KH "has reason to believe [conduct] may violate criminal, civil, or administrative law related to any Federal health care program[,]" such as "Federal health care program statutes, regulations, or directives issued by relevant agencies . . . ."

KH was subject to significant penalties if it failed to comply with the Integrity Agreement, including exclusion from participation in Federal health care programs.

---

[4] The Integrity Agreement defined "material deficiency," in relevant part, as

> anything that involves: (i) a substantial overpayment or improper payment relating to any Federal health care program; (ii) a material violation of any Federal health care program statutes, regulations, or directives issued by relevant regulatory agencies . . . ; or (iii) the provision of items or services of a quality that materially fails to meet professionally recognized standards of health care.

III.

In 1998, KH's Central Billing Office (Billing Office) assumed responsibility for billing claims submitted for KMS's physician services. Generally, claims for KMS physician services were submitted using Health Care Financing Administration (HCFA) 1500 forms, which physicians completed and submitted to the Billing Office. According to this form, the signing physician must certify that the services listed were (1) "medically indicated and necessary for the health of the patient," and (2) "were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise permitted by Medicare or CHAMPUS regulations."[5]

In March 1999, the Billing Office instituted a new billing policy to clarify confusion over whether certain procedures could be billed to a third party payor if performed by a nurse practitioner. The new policy covered four invasive procedures being performed in the pediatric Hematology/Oncology Department: (1) "Chemotherapy into CNS [(Central Nervous System)]"; (2) "Bone Marrow Aspiration"; (3) "Bone Marrow Biopsy"; and (4) "Lumbar Puncture, Diagnostic." At that time, a majority of these invasive procedures were being performed by Nurse Fochtman, who was employed by KMCWC, and not by KMS. Questions were raised concerning whether Nurse Fochtman's

---

[5] The HCFA 1500 form further clarified that for services to be considered "incident" to a physician's professional service, "1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills."

The HCFA 1500 form also included a disclaimer which stated, "[b]ecause this form is used by various government and private health programs, see separate instructions issued by applicable programs." At the time relevant to this case, Hawai'i Medicaid officials had not published controlling rules or directives that permitted a physician to bill for a procedure performed by a non-employee.

performance of the invasive procedures could be billed by KMS physicians.

The new billing policy required that "patient charts must contain evidence that a physician, not a [nurse practitioner], personally performed the [invasive] [p]rocedures *in question in order for a claim to be submitted to a third party payor*." Meetings were held between the Billing Office and PAU physicians, including Dr. Woodruff, where the new policy was discussed. According to the HPH Defendants, these meetings made clear to the physicians that the physicians could not bill third party payors for the four invasive procedures if the procedures were performed by Nurse Fochtman.

Apparently, there was resistance by Drs. Woodruff and Wilkinson to the Billing Office's new policy and disagreement over how it should be applied and interpreted. Both Drs. Woodruff and Wilkinson reported their concerns regarding the new billing policy to KH compliance officials. On February 11, 2001, Dr. Wilkinson called KH's compliance hotline. The compliance hotline report states:

> Dr. Wilkinson stated charges for bone marrow and spinal taps have been inconsistent in the Children's Blood and Cancer Center. Dr. Wilkinson stated when a doctor performs these Procedures, the patient is billed, however, when these Procedures are performed by a nurse practitioner, the patient is not billed, which is actually a discount (details withheld). Dr. Wilkinson believes these discounts are amounting to approximately $40,000 a year, and have been occurring since 1997 (exact date unknown). Dr. Wilkinson stated when he realized what was occurring, he felt it was best to report the issue before the OIG found the department to be inconsistent.

On February 21, 2001, Dr. Woodruff sent an email to KH Compliance Officer Bob Ching. In her email, Dr. Woodruff suggested that KMS hire Nurse Fochtman so that KMS physicians could bill for Nurse Fochtman's performance of invasive procedures. Dr. Woodruff stated, "[t]he problem is, is that when [Nurse Fochtman] does these procedure [sic], the doctors cannot charge for these services. We all understand that the doctors

7

could charge for these services if she were an employee of the doctors (KMS)."

Dr. Woodruff also sent an email to Dr. Winn, KMS's Chief Medical Officer, on April 5, 2001, suggesting that KMS hire Nurse Fochtman in order to address the employment requirement. Dr. Winn, however, determined that KMS's hiring of Nurse Fochtman would not resolve the billing issue. Dr. Winn explained that "[e]ven though the PAU was an outpatient kind of an arrangement, it was still within the hospital confines, and so the feeling of our compliance group and our [Billing Office] was that it wouldn't be a billable service, even if [Nurse Fochtman] work[ed] for [KMS]."

III.

In May 2001, KH requested that D&T conduct an investigation and audit concerning the billing practices of the Hematology/Oncology Department. D&T's investigation focused on the physician billing practices for the four invasive procedures. Warren was also retained by KH to assist in the investigation.

As part of its investigation, D&T examined two separate time periods: (1) February 1997 to September 1999 (the 1997 period); and (2) January 2000 to May 2001 (the 2000-01 period). In its investigation, D&T reviewed patient files and resultant billing claims submitted by KMS physicians; reviewed invasive procedure schedule logs kept by Nurse Fochtman, which logged the procedures she performed in the Hematology/Oncology Department; and interviewed medical staff, including Dr. Woodruff, Dr. Wilkinson, and Nurse Fochtman.

D&T created reports that summarized its findings regarding each time period. The report relating to the 1997 period determined that claims for invasive procedures were billed in error by Hematology/Oncology physicians where they were documented as "[p]erformed by a [nurse practitioner] with either no documented attending physician supervision and/or no physician documentation[.]" This report found that these billings were in error based on Medicare regulations, which the report found did

8

not permit the Hematology/Oncology physicians to bill for invasive procedures performed by a nurse practitioner, whom they did not employ, in the hospital setting of the PAU. The report relating to the 2000-01 period determined that Nurse Fochtman performed 314 invasive procedures from January 2000 through May 2001; Hematology/Oncology physicians submitted claims for 101 of these 314 procedures; of the 101 claims submitted, 85 were submitted by Dr. Woodruff; and that the 85 claims submitted by Dr. Woodruff resulted in approximately $22,500 in billings.

After reviewing D&T's findings, Warren recommended to KH that a self-disclosure be made to the OIG pursuant to the Integrity Agreement. Warren prepared a Voluntary Disclosure Submission (VDS) on behalf of KH and sent it to the OIG on September 4, 2001. The VDS incorporated and attached the D&T reports. The VDS, in relevant part, reported that:

> On March 10, 1999, KH's [Billing Office] issued a new billing policy covering four (4) *invasive* procedures ("Procedures") performed in KMCWC's Pediatric [Hematology/Oncology] Department. The policy established that patient charts must contain evidence that a physician, not an "advanced practice registered nurse" ("nurse practitioner"), personally performed the Procedures *in question in order for a claim to be submitted to a third party payor.* . . .
>
> . . . .
>
> Because of his disagreement with this policy, [Dr.] Wilkinson encouraged the physicians in his Department to develop their own "interpretation" of the policy that would allow the submission of claims when a nurse practitioner performed the *invasive* aspect of the procedure in violation of the March 10 policy. This action by the [Hematology/Oncology] Division Director contributed to [Hematology/Oncology] physicians, particularly [Dr.] Woodruff, <u>submitting invalid claims to KH's Central Billing Office for payment by third party payors</u>. . . .
>
> . . . .
>
> Dr. Woodruff appears to have adopted an interpretation of the new policy apparently designed to avoid compliance with it and made no effort to verify the legitimacy of her interpretation. For example, [Dr.] Woodruff states that she would be allowed to bill for an *invasive* procedure performed by a nurse practitioner if she ([Dr.] Woodruff) was present during the invasive procedure; did not participate in the invasive procedure itself; and merely labeled the resulting specimen or checked medication. Under these circumstances,

> she would then make a chart entry saying that she "participated in" the invasive procedure. . . .
>
> . . . .
>
> No current authority would allow these invasive Procedures to be billed to third party payors if performed by a nurse practitioner in the [Hematology/Oncology] Department hospital setting.

(Footnotes omitted; format altered; certain emphasis added.) The VDS identified approximately $65,000 in funds received from various third party payors, including Medicaid, MedQuest Programs, Medicare/TRIcare, and Private Payors, based on the "invalid claims," which KH intended to reimburse.

The VDS also disclosed that Nurse Fochtman, who was practicing as a nurse practitioner, only had a license as a registered nurse. The VDS stated:

> Although this Disclosure document refers to nurse Dianne Fochtman as the [Hematology/Oncology] "nurse practitioner," the current investigation discovered that she failed to complete one or more requirements necessary to be licensed in Hawaii in that license category. A nurse practitioner is, under Hawaii law, a specialty category of an "advanced practice registered nurse." As a result, Fochtman was acting, during all or part of the time period covered by this Disclosure, as a nurse practitioner when, in fact, she was licensed *only* as a registered nurse.
>
> In light of this discovery, KH has carefully reviewed the issues of quality of care and patient health relating to Fochtman's conduct and has concluded that no issue is present regarding these issues.

In late August 2001, Warren conducted a compliance training seminar on behalf of KH. In the training seminar, Warren used a hypothetical scenario similar to the billing issues discovered in the Hematology/Oncology Department. The scenario did not mention Dr. Woodruff's or Dr. Wilkinson's name.

IV.

KH offered to allow Dr. Woodruff to resign in lieu of termination. Dr. Woodruff did not resign. In January 2002, her employment with KMS and KMCWC was terminated. Dr. Woodruff also lost her position as an associate professor at the Burns Medical School, which had been funded under her KMCWC employment.

In March 2002, the Chief Executive Officer of KMCWC suspended Dr. Woodruff's medical staff privileges. In accordance with KMCWC Medical Staff By-laws, the Medical Executive Committee reviewed the decision to suspend Dr. Woodruff's medical staff privileges. The Medical Executive Committee determined that the suspension of Dr. Woodruff's staff privileges was unwarranted and that the suspension should be lifted.

IV.

In January 2002, Dr. Woodruff filed her initial complaint in this case. Dr. Woodruff was allowed to amend her complaint twice, and HCBCG was added as a plaintiff in the second amended complaint, which incorporated claims that HCBCG had asserted in a separate lawsuit filed in federal court.

In their second amended complaint, Plaintiffs alleged fifteen counts, including counts (1) seeking injunctive relief to require the HPH Defendants to offer patients the option of receiving team care that includes Dr. Woodruff; (2) asserting anti-trust and unfair competition claims; (3) asserting defamation; (4) asserting claims related to the termination of Dr. Woodruff's employment with KMS and KMCWC; and (5) asserting claims for tortious interference and intentional harm. The fifteen courts were: "Injunctive Relief -- Restoration of Team Care by KMS" (Count I); "Unlawful Combination Restraining Trade and Price-Fixing, Violation of [Hawaii Revised Statutes (HRS)] §480-4(a)" (Count II); "Unlawful Attempt to Control Prices and Refusals to Deal, Violation of [HRS] §§480-4(b), 6" (Count III); "Unfair Competition, Violation of [HRS] §480-2" (Count IV); "Monopolization of/Attempt to Monopolize Pediatric and Neonatal Acute In-Hospital and Outpatient Care in Pediatric Hematology/Oncology, Violation of [HRS] §480-9" (Count V); "Monopolization of/Attempt to Monopolize the Practice of Pediatric Hematology/Oncology, Violation of HRS §480-9" (Count VI); "Unlawful Publication of Misleading/Confusing Information, Violation of Chap. HRS 481 A" (Count VII); "Violation of Right of Due Process" (Count VIII); "Defamation" (Count IX); "Retaliatory

11

Discharge" (Count X); "Promissory Estoppel" (Count XI); "Breach of Contract" (Count XII); "Breach of Implied Covenant of Good Faith and Fair Dealing in the KMCWC Bylaws" (Count XIII); "Tortious Interference with Economic Advantage" (Count XIV); and "Prima Facie Tort" (Count XV).

Plaintiffs asserted all counts of the second amended complaint against the HPH Defendants. In the Circuit Court, Plaintiffs clarified that they only sought relief against D&T and Warren in Counts IX (Defamation), X (Retaliatory Discharge), and XV (Prima Facie Tort).

Defendants filed multiple motions for summary judgment. Through a series of orders, the Circuit Court granted summary judgment on all counts in favor of Defendants and against the Plaintiffs.[5] Based on these orders, the Circuit Court entered

---

[5] The six orders issued by the Circuit Court which collectively granted summary judgment in favor of Defendants on all counts are:

(1) "Order Granting Defendant Deloitte & Touche LLP's Motion for Summary Judgment as to Count IX (Defamation) of the Second Amended Complaint Filed on February 17, 2005";

(2) "Order Granting Defendant Dennis Warren, Esq.'s Motion for Summary Judgment (Filed April 13, 2006) and Substantive Joinders Thereto filed On Behalf of Defendant Deloitte & Touche LLP and Defendants Hawai'i Pacific Health, Kapi'olani Medical Specialists, Kapi'olani Medical Center for Women and Children, Roger Drue, Frances A. Hallonquist, Neal Winn, M.D., and Sherrel Hammar, M.D.";

(3) "Order Granting in Part and Denying in Part Defendant Deloitte & Touche LLP's Motion for Summary Judgment as to All Remaining Counts of the Second Amended Complaint";

(4) "Order Granting in Part and Denying in Part Defendants Hawai'i Pacific Health, Kapi'olani Medical Specialists, Kapi'olani Medical Center for Women and Children, Roger Drue, Frances A. Hallonquist, Neal Winn, M.D. and Sherrel Hammar, M.D.'s Motion for Partial Summary Judgment, Filed on May 11, 2007";

(5) "Order Granting Defendants Hawai'i Pacific Health, Kapi'olani Medical Specialists, Kapi'olani Medical Center for Women and Children, Roger Drue, Frances A. Hallonquist, Neal Winn, M.D. and Sherrel Hammar, M.D.'s Motion for Partial Summary Judgment as to Counts VIII, XII, and XIV, Filed November 13, 2007"; and

(6) "Order Granting Defendants Hawai'i Pacific Health, Kapi'olani Medical Specialists, Kapi'olani Medical Center for Women and Children, Roger Drue, Frances A. Hallonquist, Neal Winn, M.D. and Sherrel Hammar, M.D.'s Motion for Summary Judgment as to All

(continued...)

12

its "Final Judgment" in favor of Defendants on all counts of the second amended complaint on October 6, 2008.

V.

On appeal, Plaintiffs argue that the Circuit Court committed various errors in granting summary judgment in favor of Defendants. In their points of error on appeal, Plaintiffs contend that the Circuit Court erred in: (1) determining that Defendants held a qualified privilege for the alleged defamatory statements they made, and that Defendants did not abuse any qualified privilege they held; (2) determining that there was no clear public policy mandate to support Dr. Woodruff's claim based on Parnar v. Americana Hotels, Inc., 65 Haw. 370, 652 P.2d 625 (1982); (3) determining that Dr. Woodruff was an at-will employee, no exception to the at-will doctrine applied, and no modification had been made to KMS's and KMCWC's right to terminate Dr. Woodruff's employment at will; (4) construing Dr. Woodruff's bad faith claim in Count XIII; (5) interpreting Dr. Woodruff's employment contract with KMS as not incorporating the KMCWC Medical Staff By-laws and determining that the termination of her employment did not adversely affect her privileges; (6) determining that the HPH Defendants did not purposely intend to interfere with Plaintiffs' economic advantage; and (7) "finding no evidence HPH Defendants engaged in unfair competitive conduct, or boycott or other exclusionary tactics, or monopolization or attempted monopoly, or publishing information designed to mislead patients and physicians seeking HCBCG." For the reasons discussed below, we affirm the Circuit Court's Final Judgment against Plaintiffs and in favor of Defendants.

In their cross-appeal, the HPH Defendants challenge the purported "deemed denial" of their motion for costs. The HPH Defendants argue that: (1) the Circuit Court erred in not granting the HPH Defendants' motion for costs as prevailing

---

6/ (...continued)
Remaining Claims, filed February 15, 2008".

13

parties; and (2) the Circuit Court erred in failing to dispose of the HPH Defendants' motion for costs within 90 days of the motion's file date. We conclude that Plaintiffs' notice of appeal divested the Circuit Court of jurisdiction to decide the HPH Defendants' motion for costs. Because the Circuit Court was divested of jurisdiction, the motion for costs was not deemed denied, the motion is still pending in the Circuit Court, and there is no ruling on that motion for this court to review. We therefore dismiss the HPH Defendants' appeal from the purported deemed denial of their motion for costs.

DISCUSSION

I. PLAINTIFFS' APPEAL

A.

We review a trial court's grant or denial of summary judgment *de novo*, Querubin v. Thronas, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005), using the same standard applicable to the trial court. Iddings v. Mee-Lee, 82 Hawai'i 1, 5, 919 P.2d 263, 267 (1996). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (2000). The evidence and the inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party. Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawai'i 92, 104, 176 P.3d 91, 103 (2008).

The party moving for summary judgment has the initial burden of producing evidence to support its motion and the ultimate burden of persuasion. Jou v. Dai-Tokyo Royal State Ins. Co., 116 Hawai'i 159, 164, 172 P.3d 471, 476 (2007).

> Once the moving party has satisfied its initial burden of showing the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law, the opposing party "may not rest upon the mere allegations or denials of [the opposing party's] pleading" but must come forward, through affidavit or other evidence, with "specific

14

> facts showing that there is a genuine issue for trial."
> HRCP Rule 56(e). If the opposing party fails to respond in
> this fashion, the moving party is entitled to summary
> judgment as a matter of law. <u>Hall v. State</u>, 7 Haw. App.
> 274, 284, 756 P.2d 1048, 1055 (1988); <u>see also</u> HRCP 56(e).

<u>Wittig v. Allianz, A.G.</u>, 112 Hawai'i 195, 200, 145 P.3d 738, 743
(App. 2006) (brackets in original). "A party opposing a motion
for summary judgment cannot discharge his or her burden by
alleging conclusions, 'nor is [that party] entitled to a trial on
the basis of a hope that he [or she] can produce some evidence at
that time.'" <u>Henderson v. Prof'l Coatings Corp.</u>, 72 Haw. 387,
401, 819 P.2d 84, 92 (1991) (quoting 10A Charles Alan Wright,
Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and Procedure</u>
§ 2727 (2d ed. 1983)).

                                    B.

        At the outset, we note that Plaintiffs' opening brief
is deficient in several respects. This includes: (1) Plaintiffs'
failure to append a copy of the judgment and orders "relevant to
any point on appeal," Hawai'i Rules of Appellate Procedure (HRAP)
Rule 28(b)(3) (2008); (2) Plaintiffs' failure, in their points of
error, to state (a) "where in the record the alleged error
occurred" and (b) where in the record the error was objected to
or brought to the trial court's attention, HRAP Rule 28(b)(4)
(2008); and (3) Plaintiffs' failure, as to certain points of
error, to make any discernable argument, HRAP Rule 28(b)(7)
(2008). In addition, although Plaintiffs challenge the Circuit
Court's orders granting summary judgment, they failed to include
transcripts of any of the hearings on the underlying motions for
summary judgment in the record. HRAP Rule 10 (2009) imposes an
obligation on the appellant to order transcripts of oral
proceedings before the trial court when the appellant "desires to
raise any point on appeal that requires consideration of [such]
oral proceedings[.]" HRAP Rule 10(a)(1)(A); <u>see</u> <u>Bettencourt v.</u>
<u>Bettencourt</u>, 80 Hawai'i 225, 230, 909 P.2d 553, 558 (1995) ("The
burden is upon appellant in an appeal to show error by reference
to matters in the record, and he or she has the responsibility of

                                    15

providing an adequate transcript." (internal quotation marks, citation, and brackets omitted)).

Unless otherwise indicated, we will not consider any points of error for which Plaintiffs have failed to present discernable arguments. See HRAP Rule 28(b)(7) ("Points not argued may be deemed waived."); Hawaii Ventures, LLC v. Otaka, Inc., 114 Hawai'i 438, 478-79, 164 P.3d 696, 736-37 (2007) (stating that "an appellate court is not obliged to address matters for which the appellant has failed to present discernable arguments"); Ala Moana Boat Owners' Ass'n v. State, 50 Haw. 156, 158, 434 P.2d 516, 518 (1967) (stating that "generalities and assertions amounting to mere conclusions of law" in a brief are insufficient to require the court's attention). Moreover, although we conclude that Plaintiffs' failure to include transcripts of the summary judgment hearings does not preclude us from reviewing the summary judgment orders, see Marn v. Reynolds, 44 Haw. 655, 663, 361 P.2d 383, 388 (1961) (noting that an appellate court may review an appeal where a missing transcript "is not necessary to the disposition of the appeal on the merits"), we will resolve any dispute over matters presented at the hearings that cannot be resolved due to the absence of the transcripts in favor of affirming the Circuit Court's rulings. See Bettencourt, 80 Hawai'i at 230, 909 P.2d at 558 ("The law is clear in this jurisdiction that the appellant has the burden of furnishing the appellate court with a sufficient record to positively show the alleged error." (internal quotation marks and citation omitted)). Subject to these conditions, we will address Plaintiffs' claims, for which Plaintiffs have presented discernable argument, on the merits, notwithstanding the deficiencies in their opening brief.

C.

Plaintiffs argue that the Circuit Court erred in granting summary judgment in favor of Defendants on Plaintiffs' defamation claims. Plaintiffs' defamation claims against Defendants arose from (1) D&T's billing investigation reports;

16

(2) Warren's preparation of the VDS, which used information contained in D&T's reports and included the reports as attachments, and his submission of the VDS on KH's behalf to the OIG; (3) Warren's presentation at a compliance training seminar; and (4) alleged statements made by KMS employees Drs. Winn and Hammar. In granting summary judgment in favor of Defendants, the Circuit Court ruled that Defendants had a qualified privilege with respect to the alleged defamatory statements and that Defendants had not abused their qualified privilege. We conclude that Plaintiffs have not shown that the Circuit Court erred in granting summary judgment in favor of Defendants.

1.

A plaintiff must establish the following four elements to sustain a claim for defamation:

> (a) a false and defamatory statement concerning another;
>
> (b) an unprivileged publication to a third party;
>
> (c) fault amounting at least to negligence on the part of the publisher [actual malice where the plaintiff is a public figure]; and
>
> (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

Gold v. Harrison, 88 Hawai'i 94, 100, 962 P.2d 353, 359 (1998) (brackets in original) (quoting Dunlea v. Dappen, 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996)).

Even if a statement is defamatory, the author of the statement is protected by a qualified privilege when he or she "reasonably acts in the discharge of some public or private duty, legal, moral, or social, and where the publication concerns subject matter in which the author has an interest and the recipients of the publication a corresponding interest or duty." Russell v. American Guild of Variety Artists, 53 Haw. 456, 460, 497 P.2d 40, 44 (1972). "In claiming such privilege, it is essential that the author of the defamatory matter and the recipients have a common interest and the communication is of a

17

type reasonably deemed to protect or further that interest." Vlasaty v. Pacific Club, 4 Haw. App. 556, 564, 670 P.2d 827, 832 (1983).

A qualified privilege "is conditional and is lost if it is abused." Id. at 564, 670 P.2d at 833. The qualified privilege is lost if the holder abuses the privilege by "(1) excessive publication, (2) use of the occasion for an improper purpose, or (3) lack of belief or grounds for belief in the truth of what is said." Kainz v. Lussier, 4 Haw. App. 400, 405, 667 P.2d 797, 802 (1983). The party claiming defamation has the burden of proving that a qualified privilege was abused. See Towse v. State, 64 Haw. 624, 632, 647 P.2d 696, 702 (1982).

The threshold question of whether the qualified privilege exists is a question of law for the court to determine. Calleon v. Miyagi, 76 Hawai'i 310, 319, 876 P.2d 1278, 1287 (1994). If a privilege exists, the question of whether it has been abused is normally an issue for jury determination." Id. However, where no genuine issue of material fact is presented on whether the qualified privilege has been abused, summary judgment is appropriate. See Vlasaty, 4 Haw. App. at 564, 670 P.2d at 833 (determining that there was no genuine issue of material fact on the issue of the abuse of the qualified privilege in upholding the trial court's grant of summary judgment against plaintiff on his defamation claim).

2.

We conclude that the Circuit Court did not err in determining that Defendants were protected by a qualified privilege. In conformity with KH's obligations under the Integrity Agreement, including its obligation to retain an independent review organization to audit its billing practices and verify compliance with applicable standards, KH hired D&T to conduct an investigation and audit concerning the billing practices of the Hematology/Oncology Department. Pursuant to this engagement, D&T prepared reports of its investigative findings, which were used in preparing the VDS. KH also retained

18

Warren as legal counsel to address potential billing compliance issues in the Hematology/Oncology Department. Warren reviewed the results of D&T's investigation; recommended that to ensure compliance with the Integrity Agreement, KH make a self-disclosure to the OIG; and prepared the VDS submitted to the OIG. In furtherance of the training requirements imposed by the Integrity Agreement, Warren also conducted, on behalf of KH, the compliance training seminar on billing practices in late August 2001.

KH's hiring of D&T and Warren to assist KH in complying with its obligations under the Integrity Agreement regarding the Hematology/Oncology Department's billing practices established a duty owed by D&T and Warren to KH. KH, D&T, Warren, and the OIG shared a common interest in ensuring KH's compliance with billing requirements and the Integrity Agreement. D&T prepared reports that were reasonably based on information obtained through their extensive investigation, and Warren prepared the VDS based on information contained in the D&T reports and his understanding of the obligations imposed by the Integrity Agreement. Warren also conducted the compliance training seminar as part of his duties as retained legal counsel for KH, and he shared a common interest with the physicians and other KH affiliated individuals attending the training seminar in ensuring compliance with billing requirements and the Integrity Agreement. The alleged defamatory statements made by D&T and Warren were in furtherance of the discharge of the duty they owed to KH and were protected by a qualified privilege.

KH had a legal duty to comply with statutes, rules, and directives that governed billing by its physicians and to comply with the Integrity Agreement, which required it to disclose "material deficiencies" in its billing practices. KH and the OIG shared a common interest in ensuring KH's compliance in these matters. The alleged defamatory statements made by KH (the predecessor of HPH) in the VDS were in furtherance of its legal duties and were protected by a qualified privilege.

19

Finally, the HPH Defendants had a duty to discuss the results of the investigation into the Hematology/Oncology Department's billing practices with others who worked for or with the HPH Defendants and who shared a common interest with the HPH Defendants in ensuring compliance with billing requirements and the Integrity Agreement.[2/] See Vlasaty, 4 Haw. App. at 563, 670 P.2d at 832. Statements made by the HPH Defendants in furtherance of this duty were also protected by a qualified privilege.

3.

Plaintiffs assert that the Circuit Court erred in granting summary judgment on their defamation claims. They argue that: (1) the qualified privilege did not apply because the VDS and Warren's compliance training seminar disclosed more specific details than required by the Integrity Agreement; and (2) Defendants abused the privilege because they lacked sufficient grounds for believing that what they were saying was true. Plaintiffs' arguments are without merit.

Plaintiffs claim that under the Integrity Agreement, Warren and the HPH Defendants were only required to report the existence of a billing issue in the Hematology/Oncology Department that resulted in overpayments and the amount of the overpayments. Plaintiffs contend that because information disclosed in the VDS went beyond the reporting obligations imposed by the Integrity Agreement, Warren and the HPH Defendants did not have a qualified privilege regarding the "accusatory statements in the [VDS] against Dr. Woodruff."

We conclude that the premise of Plaintiffs' argument is incorrect, and therefore, their argument fails. The Integrity Agreement required KH to self-report any overpayments or material deficiencies it discovered. In reporting a material deficiency, the Integrity Agreement required KH to submit a report that

---

[2/] The Integrity Agreement requires that in reporting a material deficiency to the OIG, KH include "any further steps KH plans to take to address such material deficiency and prevent it from recurring."

included:

> a.  a complete description of the material deficiency, including the relevant facts, persons involved, and legal and program authorities;
>
> .b.  KH's actions to correct the material deficiency; and
>
> c.  any further steps KH plans to take to address such material deficiency and prevent it from recurring.

Therefore, contrary to Plaintiffs' assertion, the Integrity Agreement required KH to submit more than a bare-boned report of the existence of a billing issue that resulted in overpayments and the amount of the overpayments.  The information in the VDS, including the information regarding Dr. Woodruff "submitting invalid claims to KH's Central Billing Office for payment by third party payors[,]" was required by the Integrity Agreement.  Accordingly, we reject Plaintiffs' argument that the qualified privilege did not apply because the VDS disclosed information that went beyond the requirements of the Integrity Agreement.

We also reject Plaintiffs' argument that the qualified privilege did not apply to Warren's compliance training seminar because he used information that went beyond the requirements of the Integrity Agreement.  Plaintiffs contend that the hypothetical scenario used by Warren in conducting his compliance training seminar "clearly implicated" Drs. Woodruff and Wilkinson as wrongdoers.  However, Dr. Woodruff acknowledged that Warren did not mention names, and she cannot remember whether Warren used the word "fraud" or the specific words he used at the training seminar.  More importantly, the Integrity Agreement required KH to provide compliance training that included a discussion of proper billing practices, procedures for documentation of medical records, the personal and legal obligations of individuals to ensure the submission of accurate bills, and examples of proper and improper billing practices.[8]

---

[8] In addition, as noted, the Integrity Agreement required KH to include in any report of a material deficiency "any further steps KH plans to take to

(continued...)

21

Warren's compliance seminar and his use of hypothetical scenarios fell squarely within the requirements of the Integrity Agreement. Therefore, Plaintiffs' argument that the qualified privilege did not apply to the information disclosed in the compliance seminar is without merit.

4.

Plaintiffs argue that Warren and the HPH Defendants abused the qualified privilege, and thereby lost it, because they lacked sufficient grounds for believing what they were saying about Dr. Woodruff's submitting invalid claims was true. We disagree.

The information regarding Dr. Woodruff's submitting invalid claims was based on a thorough investigation largely conducted by D&T into the billing practices of the Hematology/Oncology Department. Plaintiffs' disagreement with the conclusions reached by the investigation does not demonstrate that Warren and the HPH Defendants lacked sufficient grounds for relying on D&T's investigation and other information uncovered in forming the belief that Dr. Woodruff had submitted invalid claims.

Plaintiffs refer to the requirement in the Integrity Agreement that KH self-report material deficiencies if it has "reason to believe" its conduct may have violated applicable statutes, regulations, or program directives. They argue that this low threshold of proof shows that Warren "knew the accusations against [Dr. Woodruff] were gratuitous and not well founded." We reject this argument. We fail to see how the "reason to believe" standard for self-reporting serves to support Plaintiffs' claim that Warren (or the HPH Defendants) lacked grounds for believing the information in the VDS was true.

---

[8]/ (...continued)
address such material deficiency and prevent it from recurring." In its VDS, KH stated that one of the corrective actions it planned to take was to hold mandatory training for KMS physicians on billing practices and procedures to prevent the recurrence of the problems identified in the VDS. Warren's compliance training seminar was part of the corrective actions KH identified in the VDS.

Plaintiffs also suggest that the HPH Defendants had a motive to falsely accuse Dr. Woodruff of invalid billing so that they could cover up their improper billing on UB-92 forms[9] of invasive procedures performed by Nurse Fochtman. It was Plaintiffs' theory that the HPH Defendants conspired to falsely accuse Dr. Woodruff, thereby damaging her credibility, because they wanted to cover up the fact that Nurse Fochtman was not properly licensed as a nurse practitioner and thus could not perform the invasive procedures billed on the UB-92 forms. However, the undisputed facts in the record do not support this theory.

Indeed, in the VDS, KH itself voluntarily disclosed to the OIG the issue concerning Nurse Fochtman's licensing. The VDS stated:

> Although this Disclosure document refers to nurse Dianne Fochtman as the [Hematology/Oncology] "nurse practitioner," the current investigation discovered that she failed to complete one or more requirements necessary to be licensed in Hawaii in that license category. A nurse practitioner is, under Hawaii law, a specialty category of an "advanced practice registered nurse." As a result, Fochtman was acting, during all or part of the time period covered by this Disclosure, as a nurse practitioner when, in fact, she was licensed *only* as a registered nurse.
>
> In light of this discovery, KH has carefully reviewed the issues of quality of care and patient health relating to Fochtman's conduct and has concluded that no issue is present regarding these issues.

KH's own disclosure of Nurse Fochtman's alleged licensing deficiencies refutes any claim that the HPH Defendants were motivated by the desire to cover up such alleged deficiencies.[10]

---

[9] The VDS reported billings submitted on HCFA 1500 forms, which are used to submit claims for physician services. See United States ex rel. Woodruff v. Hawai'i Pacific Health, 560 F. Supp. 2d 988, 993 (D. Hawai'i 2008). UB-92 forms are used by hospitals to request reimbursement from third party payors "for technical charges, including room and board, equipment costs, nursing costs, laboratory costs, and medical supplies[.]" Id.

[10] We note that Drs. Woodruff and Wilkinson filed a *qui tam* action in federal district court against HPH, KMS, and KMCWC based in part on Drs. Woodruff and Wilkinson's theory that the UB-92 forms were false because the forms billed for Nurse Fochtman's performance of invasive procedures, even though she was not a licensed nurse practitioner and thus not licensed to

(continued...)

We conclude that Plaintiffs' unsupported speculation over the HPH Defendants' motives failed to raise any genuine issue of material fact regarding abuse of the qualified privilege and that the Circuit Court properly ruled that Defendants had not abused the privilege.

D.

In their second amended complaint, Plaintiffs alleged that the HPH Defendants breached Dr. Woodruff's employment contracts in terminating her. However, as the HPH Defendants argue and as the record shows, Dr. Woodruff was an at-will employee whose employment was subject to termination "for any reason or no reason." Shoppe v. Gucci America, Inc., 94 Hawaiʻi 368, 383, 14 P.3d 1049, 1064 (2000) (internal quotation marks and citation omitted). Under Hawaiʻi law, "an employment contract of indefinite duration will generally be construed as giving rise to an at-will employment relationship and [is] therefore terminable at the will of either party for any reason or no reason." Id. Dr. Woodruff's employment with KMS and KMCWC was for an indefinite duration and therefore she was employed at will. In addition, Dr. Woodruff signed employment documents in which she specifically acknowledged her at-will employment status.

On appeal, Plaintiffs do not challenge the Circuit Court's determination that Dr. Woodruff's employment was at will. Instead, they argue that the Circuit Court erred in granting summary judgment because various exceptions to the at-will

---

10/ (...continued)
perform such procedures. See United States ex rel. Woodruff v. Hawaiʻi Pacific Health, 560 F. Supp. 2d 988, 998 (D. Haw. 2008), aff'd, 409 F. App'x 133, 2010 WL 5072191 (9th Cir. Dec. 13, 2010). The federal district court rejected this theory and granted summary judgment in favor of HPH, KMS, and KMCWC. The court held that Nurse Fochtman, who was a registered nurse, was also a properly licensed and board-certified nurse practitioner who was qualified to perform the invasive procedures. Id. at 998-99. The court therefore held that the UB-92 forms were not facially false based on Nurse Fochtman's licensing status. Id. at 998-1000. The court stated that the VDS appeared to conflate the status of an advance practice registered nurse (APRN) with that of a nurse practitioner. Id. at 998 n.9. The court explained that under Hawaiʻi law, the APRN title was not a license required to perform the invasive procedures, but only a recognition granted by the nursing board. Id. at 998-1000.

employment doctrine were applicable to Dr Woodruff's employment. The exceptions argued by Plaintiffs on appeal are: (1) the public policy exception set forth in Parnar, 65 Haw. 370, 652 P.2d 625; and (2) the exception set forth in Kinoshita v. Canadian Pacific Airlines, Ltd., 68 Haw. 594, 724 P.2d 110 (1986). We conclude that these exceptions did not undermine the Circuit Court's grant of summary judgment.[11]/

In Parnar, the Hawai'i Supreme Court held that there is a public policy exception to an employer's generally unlimited right to discharge an at-will employee, and that an employer may be held liable in tort, where the employer's "discharge of an employee violates a clear mandate of public policy." Parnar, 65 Haw. at 380, 652 P.2d at 631. The court further stated:

> In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy. However, courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.

Id.

Plaintiffs argue that at-will terminations of medical specialists should not be permitted because they drive up the costs of health care, will adversely affect the availability of doctors in Hawai'i, and may force doctors to abandon their patients. In essence, Plaintiffs argue that the at-will employment laws should not apply to medical specialists and that the Parnar exception should presumptively apply to the termination of medical specialists. Plaintiffs cite no authority to support their argument, and courts from other jurisdictions have concluded that physicians can be employed on an at-will basis. See e.g., Lobel v. Maimonides Medd Ctr., 835 N.Y.S. 2d

---

[11]/ Plaintiffs also refer to the "permanent employment" and "additional consideration" exceptions to the at-will doctrine. However, because Plaintiffs fail to present discernable argument on how these exceptions would apply to this case or why the Circuit Court erred in failing to apply them, we decline to address these exceptions.

28, 30 (N.Y. App. Div. 2007); <u>Miranda v. Wesley Health Sys., LLC</u>, 949 So. 2d 63, 67-68 (Miss. Ct. App. 2006). We conclude that Plaintiffs have failed to identify "a constitutional, statutory, or regulatory provision or scheme" that established a clear mandate of public policy that was violated by Dr. Woodruff's at-will termination. <u>See</u> <u>Parnar</u>, 65 Haw. at 380, 652 P.2d at 631. Therefore, Plaintiffs' <u>Parnar</u> claim fails as a matter of law.

In <u>Kinoshita</u>, the Hawai'i Supreme Court acknowledged an exception to the at-will doctrine where an employer's right to discharge an employee is "contractually modified and, thus, qualified by statements contained in employee policy manuals or handbooks issued by employers to their employees." <u>Kinoshita</u>, 68 Haw. at 601, 724 P.2d at 115-16 (internal quotation marks and citation omitted). Under this exception, an employer will be bound by its statements of policy where such statements were circulated under circumstances that "created a situation instinct with an obligation" and "with an intention to create expectations and induce reliance by employees[.]" <u>Id.</u> at 603, 724 P.2d at 117 (internal quotation marks and citations omitted).[12]

In this case, however, Plaintiffs' <u>Kinoshita</u> claim is without merit because the HPH Defendants did not create an expectation or induce Dr. Woodruff's reliance on any belief that would conflict with her status as an at-will employee. Indeed, the HPH Defendants provided Dr. Woodruff with numerous documents, which Dr. Woodruff signed, that specifically stated that her employment was at will. For example, Dr. Woodruff's KMS employment application stated: "I understand that if I am employed, my employment is 'at will' and can be terminated at any time, either by myself or Kapi'olani Health, with or without cause or reason, and with or without notice." Upon being hired by KMS, Dr. Woodruff signed an employment agreement, in which she acknowledged understanding that her "employment is on an 'at

_____

[12] In <u>Kinoshita</u>, the employer had promulgated policies and procedures in an effort to defeat attempts at unionization. <u>Kinoshita</u>, 68 Haw. at 603, 724 P.2d at 117.

will' basis.". Upon receiving KH's employee handbook, Dr.
Woodruff signed an acknowledgment form which stated: "All
Kapi'olani Health employees are employed on an 'at will' basis."
Under these circumstances, Plaintiffs do not have a viable
<u>Kinoshita</u> claim.  <u>See</u> <u>Shoppe</u>, 94 Hawai'i at 385-86, 14 P.3d at
1066-67.

E.

KMCWC has Medical Staff By-laws (By-laws), which govern
physicians who are given clinical privileges and permitted to
practice at KMCWC.[13]  The By-laws include a provision that gives
a practitioner the right to a hearing when actions that will
adversely affect the practitioner's clinical privileges and
medical staff membership at KMCWC are recommended.[14]

---

[13] State of Hawai'i Department of Health rules for broad service
hospitals, such as KMCWC, require the hospital to establish "an organized
medical staff" responsible "for the quality of medical care provided to
patients, and for the ethical conduct and professional practices of its
members." Hawai'i Administrative Rules (HAR) § 11-93-22 (1992). The medical
staff, in turn, is required to develop and adopt by-laws and rules to, among
other things, "[e]stablish a framework for self government and a means of
accountability to the governing body." HAR § 11-93-22. For purposes of these
rules, "medical staff"

    means physicians, dentists, podiatrists and other individuals
    licensed by the state, who are permitted by law and who have been
    authorized by the governing body to provide patient care services
    within the facility. All medical staff members and other
    individuals who are permitted by law and by the hospital to
    provide patient care services independently in the hospital shall
    have delineated clinical privileges that allow them to provide
    patient care services within the scope of their clinical
    privileges.

HAR § 11-93-2 (1992).

[14] The By-laws provided, in relevant part, that:

    the right to a hearing shall be triggered when any one or more of
    the following actions or recommended actions shall be deemed to
    adversely affect a practitioner and constitute grounds for a
    professional review action, as defined in Hawaii Revised Statutes
    Section 671D-4:

    . . . .

    (d)    Revocation of Medical Staff membership and/or privileges;

    (e)    Involuntary decrease of clinical privileges . . . ;

(continued...)

Plaintiffs contend that the Circuit Court erred in granting summary judgment on Dr. Woodruff's employment claims because they assert that Dr. Woodruff's employment contract with

---

14/ (...continued)

. . . .

(g)     Suspension of any clinical privileges;

(h)     Termination of all clinical privileges; [and]

(i)     Summary suspension or restriction of Medical Staff membership or clinical privileges for more than fourteen (14) days[.]

As referenced in the By-laws, HRS § 671D-4 (1993 & Supp. 2012) provides the following definitions, which state in relevant part:

"Adversely affecting" includes reducing, restricting, suspending, revoking, denying, or failing to renew clinical privileges or membership in a health care entity.

"Clinical privileges" includes privileges, membership on the medical staff or panel, and the other circumstances pertaining to the furnishing of medical care under which a physician or other licensed health care practitioner is permitted to furnish such care by a health care entity.

"Professional review action" means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician which conduct affects or could affect adversely the health or welfare of a patient or patients, and adversely affects the clinical privileges, or membership in a professional society or provider panel, of the physician.  This term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action. . . .

"Professional review activity" means an activity of a health care entity with respect to an individual physician to do any of the following:

(1)     To determine whether the physician may have clinical privileges with respect to, or membership in, the entity;

(2)     To determine the scope or conditions of such privileges or membership; or

(3)     To change or modify such privileges or membership.

"Professional review body" means a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity.

KMS incorporated the By-laws and therefore entitled Dr. Woodruff to a hearing before her employment was terminated. KMS's offer of employment to Dr. Woodruff stated, in relevant part:

> As a physician, you are expected to maintain, in good standing, membership of KMCWC's Medical Staff with the privileges necessary for you to perform your employment duties and obligations to KMS. You will also be expected to observe and comply with KMCWC's Medical Staff Bylaws and all other rules, regulations, policies and procedures of KMCWC as well as KMS. At all times you will be required to maintain medical licensure and all appropriate drug licenses . . . . Loss of membership on KMCWC's Medical Staff is grounds for automatic and immediate termination of employment with KMS as an employed physician.

Based on this provision, Plaintiffs argue that the By-laws were incorporated into Dr. Woodruff's employment agreement with KMS and therefore she was entitled to a hearing before her employment was terminated. Plaintiffs' argument that KMS was required to provide Dr. Woodruff with a hearing before terminating her employment is without merit.

The cited provision of KMS's offer of employment to Dr. Woodruff imposes obligations on Dr. Woodruff with which she must comply to assure her continued employment. Dr. Woodruff must maintain her medical staff membership and clinical privileges with KMCWC or she is subject to immediate termination. The cited provision does not purport to impose additional obligations on KMS. While the cited provision incorporates the terms of the By-laws to the extent of conditioning Dr. Woodruff's employment on her compliance with the By-laws, it does not require KMS's compliance with the By-laws as a condition of the employment agreement.

Even assuming *arguendo* that KMS's compliance with the terms of the By-laws was part of its employment agreement with Dr. Woodruff, the hearing requirement under the By-laws does not apply to employment terminations, but only to adverse actions relating to staff membership and clinical privileges. Thus, the By-laws did not change the at-will nature of Dr. Woodruff's employment or require that Dr. Woodruff receive a hearing before her employment was terminated. In this regard, the distinction

29

between a physician's status as a medical staff member with clinical privileges on the one hand, and an employee on the other hand, is crucial. A physician can be a medical staff member and have clinical privileges at KMCWC without being employed by KMS or KMCWC. See HAR § 11-93-2 (definition of medical staff).[15/] The By-laws do not list actions adverse to a physician's employment as among the actions entitling a physician to a hearing; the By-laws only provide a hearing for actions adverse to a physician's KMCWC medical staff membership or clinical privileges.

We agree with the Circuit Court's reasoning that the By-laws and any due process hearing requirement only applied to clinical and membership privileges; that Plaintiffs' claims in this case deal with employment termination, not claims relating to Dr. Woodruff's clinical or membership privileges; and that the By-laws did not provide for a review hearing with respect to Dr. Woodruff's employment termination. Accordingly, we conclude that Dr. Woodruff was not entitled to a hearing on the decision to terminate her employment. See Bryant v. Glen Oaks Med. Ctr., 650 N.E.2d 622, 629-31 (Ill. App. Ct. 1995) (distinguishing between medical staff membership and employment in holding that the provisions of medical staff by-laws requiring a hearing for actions adversely affecting medical staff membership or clinical privileges were not implicated by the termination of a doctor employed on an at will basis).

Plaintiffs argue that the termination of Dr. Woodruff's employment adversely affected her medical staff membership and clinical privileges and therefore she was entitled a hearing on that basis. We disagree. While the termination of Dr. Woodruff's employment may have ended the increased access to

_____

[15/] In Bryant v. Glen Oaks Med. Ctr., 650 N.E.2d 622 (Ill. App. Ct. 1995), the court explained the distinction between the granting of medical staff privileges and employment as follows: "Staff privileges reflect the hospital's decision that a physician is qualified to practice in the facility, but do not in and of themselves confer employment." Bryant, 650 N.E.2d at 630 (internal quotation marks and citation omitted; format altered).

hospital facilities she had as an employee, it did not affect the access to and privileges at KMCWC she enjoyed as a medical staff member. Indeed, Dr. Woodruff's termination letter made clear that the termination of her employment "will not alter your medical staff privileges at [KMCWC], or your ability to renew a private practice." When KMCWC subsequently suspended Dr. Woodruff's medical staff privileges, the Medical Executive Committee reviewed the suspension as required by the By-laws. The Medical Executive Committee disagreed with KMCWC and determined that the suspension of Dr. Woodruff's privileges was unwarranted and that the suspension should be lifted. Plaintiffs do not object to the manner in which KMCWC's decision to suspend Dr. Woodruff's medical staff privileges was reviewed under the By-laws.

Our analysis also disposes of Plaintiffs' claim that the HPH Defendants violated a duty of good faith and fair dealing derived from the By-laws. This claim fails because the By-laws did not apply to the termination of Dr. Woodruff's employment.

F.

Plaintiffs contend that the Circuit Court erred in granting summary judgment on their tortious interference and competition claims. However, Plaintiffs' entire argument in support of their points of error consists of two paragraphs in which they cite conflicting expert testimony about the extent of HPH's market power and assert that the HPH Defendants' conduct injured the public interest. Plaintiffs fail to place their claims regarding the experts' testimony or injury to the public interest in context, explain why their contentions show that the Circuit Court erred in granting summary judgment, or cite any authority to support their claims. We therefore would be justified in rejecting these claims of error on the ground that Plaintiffs failed to provide discernable argument to support them.

In any event, it appears that Plaintiffs' argument relates to their contention that the HPH Defendants engaged in

31

anticompetitive behavior by referring the vast majority of patients who go to KMCWC's emergency department, and have no specific pediatric hematology-oncology doctor, to a specialist at KMS, instead of referring them to Plaintiffs. To establish a claim for unlawful monopolization, the plaintiff must not only show that the defendant possesses monopoly power in the relevant market, but that it acquired or maintained that power through anticompetitive conduct. See Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004). Plaintiffs do not cite any authority and they fail to present any argument to support the claim that the HPH Defendants' practice of referring emergency room patients with no specific pediatric hematology-oncology doctor to a specialist at KMS constituted anticompetitive conduct. Plaintiffs' reference to the conflict in the experts' opinion was relevant to the question of whether HPH possessed monopoly power. It did not show that a genuine issue of material fact existed on whether the HPH Defendants had engaged in anticompetative conduct. Accordingly, Plaintiffs fail to demonstrate that the Circuit Court erred in granting summary judgment on their anticompetitive conduct claims.

## II. THE HPH DEFENDANTS' CROSS-APPEAL

### A.

In their cross-appeal, the HPH Defendants appeal from the purported "deemed denial" of their motion for costs. The facts relevant to the HPH Defendants' cross-appeal are as follows.

After the Circuit Court entered its Final Judgment on October 6, 2008, the HPH Defendants filed their "Notice of Taxation of Costs" on October 13, 2008. On October 21, 2008, Plaintiffs filed objections to the HPH Defendants' Notice of Taxation of Costs. On October 30, 2008, Plaintiffs filed their notice of appeal from the Final Judgment. On November 6, 2008, the Clerk of the Circuit Court denied the HPH Defendants' request for costs. On November 14, 2008, the HPH Defendants filed their motion for costs, which requested that the Circuit Court review

the Clerk's denial of their request for costs.  On April 13, 2008, the HPH Defendants filed their notice of appeal from the Circuit Court's deemed denial of their motion for costs.  In their notice of appeal, the HPH Defendants asserted that the Circuit Court had not disposed of their motion for costs and therefore, the motion was deemed denied ninety days after it was filed pursuant to HRAP Rule 4(a)(3) (2006).

HRAP Rule 4(a)(3) provides:

> (3) TIME TO APPEAL AFFECTED BY POST-JUDGMENT MOTIONS. If any party files a timely motion for judgment as a matter of law, to amend findings or make additional findings, for a new trial, to reconsider, alter or amend the judgment or order, or for attorney's fees or costs, the time for filing the notice of appeal is extended until 30 days after entry of an order disposing of the motion; provided, that the failure to dispose of any motion by order entered upon the record within 90 days after the date the motion was filed shall constitute a denial of the motion.
>
> The notice of appeal shall be deemed to appeal the disposition of all post-judgment motions that are timely filed after entry of the judgment or order.

B.

The HPH Defendants' cross-appeal is premised on the assumption that their motion for costs was a motion that tolled the time for filing a notice of appeal under HRAP Rule 4(a)(3), and therefore, the motion for costs was deemed denied after the Circuit Court failed to dispose of the motion within 90 days. However, under HRAP Rule 4(a)(3), only the filing of a <u>timely</u> motion for costs (1) tolls the time for filing a notice of appeal, (2) extends the time the trial court retains jurisdiction to resolve the motion, and (3) triggers the deemed denial of the motion if not resolved within 90 days.

Here, the HPH Defendants' motion for costs was filed pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(d)(1) (2000).[16/]  Although HRCP Rule 54(d)(1) imposes a five-day time

---

[16/] HRCP Rule 54(d)(1) provides:

COSTS OTHER THAN ATTORNEYS' FEES.  Except when express provision therefor is made either in a statute or in these rules,
(continued...)

limit on seeking review of the clerk's action on a request for taxation of costs, it does not impose any time limit for filing the initial request for taxation of costs with the clerk. Because HRCP Rule 54(d)(1) does not impose any time limit measured from the entry of judgment to file a motion for costs, we conclude that a post-judgment motion for costs under HRCP Rule 54(d)(1) does not qualify as a timely motion for purposes of the tolling and deemed denial provisions of HRAP Rule 4(a)(3).[17] Accordingly, the Circuit Court was divested of jurisdiction to decide the HPH Defendants' motion for costs upon the filing of Plaintiffs' notice of appeal. See Cox v. Cox, 125 Hawai'i 19, 28-29 & n.14, 250 P.3d 775, 784-85 & n.14 (2011) (filing of notice of appeal divested family court of jurisdiction to decide motion for costs sought pursuant to Rule 68 of the Hawai'i Family Court Rules); Hoddick, Reinwald, O'Connor & Marrack v. Lotsof, 6 Haw. App. 296, 300, 719 P.2d 1107, 1111 (1986).

Because the Circuit Court was divested of jurisdiction to resolve the HPH Defendants' motion for costs, the motion is not deemed denied pursuant to HRAP Rule 4(a)(3). Rather, the motion for costs remains pending before the Circuit Court, and there is no Circuit Court ruling regarding the motion for costs for this court to review. We therefore dismiss the HPH Defendants' appeal from the purported deemed denial of their motion for costs. The Circuit Court may resolve the motion after this appeal is concluded and jurisdiction is returned to the Circuit Court.

---

[16] (...continued)
costs shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the State or a county, or an officer or agency of the State or a county, shall be imposed only to the extent permitted by law. Costs may be taxed by the clerk on 48 hours' notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.

[17] We note that prior to its amendment in 2006, HRAP Rule 4(a)(3) provided that the time for filing a notice of appeal would be tolled if any party filed the specified motions "not later than 10 days after entry judgment." In 2006, this language was changed to read, "[i]f any party files a timely motion . . . ."

CONCLUSION

Based on the foregoing, we affirm the Circuit Court's Final Judgment against Plaintiffs and in favor of Defendants. We dismiss the HPH Defendants' appeal from the Circuit Court's purported deemed denial of their motion for costs.

DATED: Honolulu, Hawai'i, January 14, 2014.

On the briefs:

Arleen D. Jouxson
Rafael G. Del Castillo
(Jouxson-Meyers & Del Castillo,
    AAL, LLLC)
for Plaintiffs-Appellants

Kenneth S. Robbins
John-Anderson L. Meyer
Sergio Rufo
(Robbins & Associates, AAL, ALC)
Patrick H. Jones
Sarah O. Wang
Melanie Mito May
(Marr Jones & Wang, ALLLP)
Douglas Ross
(Davies Wright Tremaine LLP)
Charles Robert Ching
for Defendants-Appellees
Hawai'i Pacific Health,
Kapi'olani Medical Specialists,
Kapi'olani Medical Center for
Women and Children, Roger Drue,
Frances A. Hallonquist,
Neal Winn, M.D. and
Sherrel Hammar, M.D.

Melvyn M. Miyagi
Gregg M. Ushiroda
Karen Y. Arikawa
(Watanabe Ing LLP)
for Defendant-Appellee
Deloitte & Touche LLP

John S. Nishimoto
Michael J. Van Dyke
(Ayabe, Chong, Nishimoto, Sia &
    Nakamura, ALLLP)
for Defendant-Appellee
Dennis M. Warren, Esq.

Chief Judge

Associate Judge

Associate Judge

35